UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA *EX REL* FAIR
LABORATORY PRACTICES ASSOCIATES,

                    Plaintiff,                          05 Civ. 5393 (RPP)

               - against -                      **OPINION AND ORDER**

QUEST DIAGNOSTICS INCORPORATED,            *REDACTED*
UNILAB CORPORATION, d/b/a QUEST
DIAGNOSTICS, and XYZ CORPORATIONS
1-100

                    Defendants,
--------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

**I.  Introduction**

      On May 14, 2010, Plaintiff, Fair Laboratory Practices Associates ("Plaintiff", "FLPA" or

"relators"), filed a Second Amended Complaint ("SAC") under seal in a *qui tam* action against

Defendants Quest Diagnostics Incorporated, Unilab Corporation, d/b/a Quest Diagnostics, and

XYZ Corporations 1-100 under the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33

and the respective false claims acts of seventeen states and the District of Columbia.[1] Plaintiff

alleges that Defendants violated the Federal Health Care Anti-Kickback Act, 42 U.S.C. § 1320a-

7b(b) ("Anti-Kickback Statute" or "AKS") in offering medical testing services for managed care

patients at a substantial discount or below cost in order to receive referrals of Medicare and

Medicaid patients that Defendants could bill directly.

---

[1] The Original Complaint in this action was filed under seal on June 7, 2005. Subsequently, an Amended Complaint was filed under seal on December 1, 2008. The seal on this Amended Complaint was lifted, and the Amended Complaint disclosed to the Defendants, by a September 16, 2009 Order of this Court. The Second Amendment Complaint, with limited redactions, was produced to the Defendants by August 12, 2010, pursuant to an August 10, 2010 Order of this Court.

Defendants moved to dismiss the SAC by Memorandum of Law filed under seal on October 13, 2010 and an accompanying Declaration by Stephen Gillers ("Gillers Decl."), Professor of Law at New York University School of Law, and based on special discovery pursuant to Court Orders of July 20, August 10, and September 28, 2010.[2] Plaintiff's answering memorandum, filed under seal on November 30, 2010, was accompanied by the Declaration of Andrew M. Perlman ("Perlman Decl."), Professor of Law at Suffolk University Law School. Defendants submitted a reply memorandum, filed under seal on December 10, 2010 and accompanied by the Reply Declaration of Stephen Gillers ("Gillers Reply Decl."). The Court held oral argument on December 15, 2010.

For the following reasons, Defendants' motion to dismiss FLPA's complaint is granted and FLPA, its general partners, and its counsel are disqualified from this action, and any subsequent action based on these facts.[3]

---

[2] At a conference on July 20, 2010, this Court allowed Defendants to take the depositions of FLPA's three general partners: Mark Bibi, Andrew Baker, and Richard Michaelson. This Court also ordered FLPA to respond to certain interrogatories. By subsequent orders, this Court required FLPA to produce, among other documents, the June 7, 2005 Disclosure Statement submitted by the Relator to the United States; the FLPA partnership agreement; and the engagement letters between FLPA and its counsel.

[3] To date, the United States has not intervened in this 2005 action. By Notice dated November 9, 2009 and Order of November 10, 2009, the Government advised that it had not made its intervention decision but that its investigation of Quest was continuing. (Statement of Interest of the United States in Opp. to Def. Motion at 3.) The dismissal of this complaint filed by FLPA and disqualification of FLPA and its partners from this suit has no effect on the ability of the Government to pursue its prosecution of these Defendants. (See Transcript of December 15, 2010 Hearing ("Tr. 12/15/10") at 105 ("[N]othing that we have suggested here today, including the dismissal of the claims of FLPA, would undercut the United States' ability to move to intervene in this case.")); See also U.S. ex rel Williams v. Bell Helicopter Textron Inc., 417 F.3d 450, 455-56 (5th Cir. 2005) (affirming District Court's dismissal of a relator's qui tam complaint on Rule 9(b) grounds but finding that Court erred in also dismissing potential claims by the Government, which had not intervened in the action, on the grounds that dismissal of relator's complaint was not on the merits); U.S. ex rel Laird v. Lockheed Martin Engineering, 336 F.3d 346, 358 (5th Cir. 2003) (asserting that dismissal against one relator may not necessarily preclude another relator from bringing the same suit on behalf of the government). In its Statement of Interest, the Government asked for 30 days to decide whether to move to intervene in this matter in the event that Defendants' motion was granted. The Defendants have no objection, (Tr. 12/15/10 at 10), and this Court grants that request.

## II. Background

<u>Parties</u>

FLPA is a Delaware general partnership formed by three former senior Unilab executives now employed by Life Sciences Research, Inc. ("LSR") in Hackensack, New Jersey – Andrew Baker, Richard Michaelson, and Mark Bibi – for the sole purpose of prosecuting this *qui tam* action under the FCA. (Deposition of Mark Bibi ("Bibi Dep.") at 9:12-19, 16:7-21, 136:20-22.) As a general partnership, FLPA is not an entity distinct from its partners. The FCA permits private persons, known as "relators," to bring a *qui tam* action on behalf of the United States when private persons have information that the defendant has knowingly submitted or caused the submission of false or fraudulent claims to the United States. The FCA requires that the relator's complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to intervene in the suit. FLPA is the relator in this action. The Government has not yet made its decision on whether or not to intervene.

Baker served as Chairman and Chief Executive Officer ("CEO") of Unilab from 1993 to the end of 1996. (Deposition of Andrew Baker ("Baker Dep.") at 26:9-27:6.) Michaelson served as Unilab's Chief Financial Officer ("CFO") from 1993 until about 1997, and then as a Director of Unilab until 1999. (Deposition of Richard Michaelson ("Michaelson Dep.") at 18:5-19:5.) Bibi served as Unilab's General Counsel from 1993 through spring of 2000. (Bibi Dep. at 29:3-8.) During his seven year tenure at Unilab, Bibi was the sole lawyer employed by the company and was responsible for all of the company's legal affairs. (Bibi Dep. at 29:3-8; 124:8-11.) In his role, Bibi advised the company on matters relating to its contracts with managed care

organization ("MCOs"), managed all litigation against Unilab, and advised the company on compliance with health care fraud and abuse laws, including the AKS and managed care contracting practices. (Id. at 69:12-18, 119:9-12, 125:10-126:12, 126:6-12, 128:22-131:14.) Bibi is only licensed to practice law in the state of New York. (Id. at 118: 4-6.)

Defendant Quest is a publicly-traded Delaware corporation headquartered in Madison, New Jersey, engaged in the business of providing diagnostic testing services to MCOs and independent physician associations ("IPAs") nationwide. (SAC ¶¶ 8-10.) Defendant Unilab was publicly held from 1993 to November 22, 1999. (Id. at ¶¶ 13.) On November 23, 1999, Kelso & Company ("Kelso"), a private equity firm, completed a leveraged buyout of Unilab, making the company private. (Id. at ¶ 14.)  In 2001, there was an initial public offering of Unilab. (Id. at ¶ 15.) In February 2003, Quest Diagnostics Newco Inc., a wholly-owned subsidiary of Quest, completed a cash tender offer for Unilab and thereafter Unilab became a wholly-owned subsidiary of Quest. (Id. at ¶ 16.)

The Second Amended Complaint ("SAC")

FLPA alleges, on behalf of the United States and plaintiff states, that from at least January 1, 1996 through present, Defendants violated the AKS, through their operation of an ongoing "pull through" scheme wherein Defendants charged IPAs and MCOs below cost rates for the performance of laboratory tests so as to induce the physicians in the IPAs to refer Medicare and Medicaid-reimbursable tests to the Defendants and 2) to induce the MCOs to arrange or recommend that their in-network physicians send Medicare and Medicaid-reimbursable tests to the Defendants. (Id at ¶ 3.)

4

The Anti-Kickback Statute

The AKS states in relevant part that anyone

who knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person – (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made … under a Federal health care program…shall be guilty of a felony…

42 U.S.C. § 1320a-7b(b)(2).

The AKS defines "remuneration" as including "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

The Role of the Relators

Between 1993 and 1996, Plaintiff claims that several of Unilab's officers, ████████████ ████████████ gradually came to question the legality of the "pull through" scheme employed by the company. (Pla. Opp. Memo at 3.) In 1996, for example, ████████ Michaelson became aware of an opinion letter dated September 16, 1996 written to the California Clinical Laboratory Association by its counsel W. Bradford Tully, Esq. interpreting the provision of the AKS. (Bibi Dep. at 307:7-308:22.) The letter concluded, in part, that



(Plaintiff's June 7, 2005 Disclosure Statement to the United States ("Disc. Statement"), Ex. 2 at 2.) [4]

---

[4] Relators were required to file a Notice of Disclosure Statement to the United States pursuant to 31 U.S.C.§ 3730(b)(2) in order to pursue this *qui tam* action.

While the relators were at Unilab, Unilab's prices to its managed care customers were below cost and in many cases only about 50% of cost. (Disc. Statement at 22.) Baker and Michaelson discussed Tully's letter with Bibi, ████████████████████████ ████████████████████████████ Baker and Michaelson became increasingly concerned with their pricing scheme and decided to raise Unilab's prices on testing for MCOs nearer to cost. (Baker Dep. at 152:5-153:3; Michaelson Dep. at 68:22-72:22.) As a result of this increase in costs, "Unilab's customers began to slowly slip away to Unilab's competitors" and Unilab's profitability decreased. (SAC at ¶¶ 93-94.) Baker was ousted as CEO of Unilab in 1997 as a consequence. (Id. at ¶ 95.) David Weavil succeeded Baker as CEO and continued Baker's strategy of increasing contracting prices. (Id. at ¶¶ 97-98.) In November of 1999, Kelso & Co. completed a leveraged buyout of Unilab for $5.85 per share and brought in new management, including Robert Whalen as CEO. It is alleged that Whalen began a more aggressive pursuit of unlawful kickback schemes during his tenure. (Id. at ¶ 103.)

On December 7, 1999, the Office of the Inspector General for the Department of Health and Human Services ("OIG") released Advisory Opinion 99-13, which indicated that if the prices offered to MCOs were below-cost, which the opinion stated as meaning below "total cost,"[5] the OIG would infer that such pricing was offered for the purpose of inducing fee-for-service pull-through business in violation of the AKS. (Disc. Statement, Ex.7.) Bibi █████ ███████████████████████████████████████ called D. McCarty Thornton, Chief Counsel to the OIG and author of Advisory Opinion 99-13, █████████ ████████████████████ (Bibi Dep. at 46:8-47:6; 256:20-257:8.)

_____
[5] Advisory Opinion 99-13 stated: "In determining whether a discount is below cost, we look, for example, at the total of all costs including labor, overhead, equipment, etc.) divided by the total number of laboratory tests." (Disc. Statement, Ex. 7 at 6.)



(Bibi Dep. at 40:2-19.)

(Id. at 41:9-20).





(Id. at 59:21-60:10, 60:17-61:12.)

(Id. at 46:10-47:6.)[6]

(Id. at 43:14-22; 45:10-46:3.)[7] Bibi then testified as follows:



---

[6] The OIG subsequently clarified its position by letter dated April 26, 2000 which stated that "discount arrangements below those benchmarks (discussed in 99-13) are not illegal *per se* but only 'suspect' in the sense that they may merit further investigation depending on the facts and circumstances presented." (Declaration of Scott D. Stein, Esq. ("Stein Decl.") at Ex. 12.) In 2004, the OIG again addressed the issue and stated that discount arrangements are "particularly suspect." (Disc. Statement at 48 & Ex. 15.)

[7] Bibi testified at his deposition that he had not previously disclosed to his counsel any of Whalen's comments during this 2000 meeting. (Bibi Dep. at 42:5-43:13; 74:3-76:4.) Bibi also maintained that he did not disclose to Baker and Michaelson the substance of his communications with Whalen regarding Unilab's contracting practices until after he came to the conclusion in September 2004 that he could participate in this lawsuit. (Id. at 174:17-177:11.)

(<u>Id</u>. at 45:19-46:7.)



(<u>Id</u>. at 83:9-84:3.)

(<u>Id</u>. at 225:20-226:12.)

(<u>Id</u>. at 88:11-89:4; 99:16-100:17).[8]

(<u>Id</u>. at 101:19-102:19; Disc. Statement, Ex. 19.)

(Bibi Dep. at 103:8-20.) Shortly after these events, Bibi was "frozen out" and no longer asked for his advice on compliance matters. (<u>Id</u>. at 81:15-82:2, 101:11-102:11). Bibi stayed on as General Counsel until March 2000 to provide transitional assistance to his replacement, David Gee. (Disc. Statement at 31.)

(<u>Id</u>.) While in private practice, Gee had written extensively for

publicly circulated laboratory newsletters specifically referring to the OIG opinions and warning the industry about the dangers of below cost and "pull through" kickbacks. (Id. & Ex. 13, 14; SAC at ¶ 105.) Upon leaving Unilab, Bibi rejoined Baker and Michaelson, and became general counsel of LSR, where Baker was CEO and Michaelson was CFO. (Def. Memo at 5-6.)

Three years later, in 2003, Kelso sold Unilab to Quest for approximately $26.50 per share. Baker subsequently called R. Jeffrey Lanzolatta, the President of Unilab's Southern California Division until Quest's acquisition, and asked him why and how Unilab's stock price had dramatically increased since its acquisition by Kelso in 2000. Baker stated that Lanzolatta told him that Unilab had returned to "pull-through" arrangements and made them very profitable during the Kelso period. Baker stated that Lanzolatta also told him that Quest itself was engaged in the same "pull through" practices on a nationwide scale. (Baker Dep. at 104:13-105:22, 107:17-108:3). Baker then reported to Bibi what Lanzolatta had told him regarding Unilab's continuing use of the "pull through" scheme under Whalen. (Bibi Dep. at 104:4-22). Bibi testified that he then spoke with Lanzolatta directly in a series of meetings in 2004 and 2005 during which time Lanzolatta told Bibi that under Whalen, Unilab expected the IPAs and HMOs to refer 100% of their non-managed care business to Unilab, to instruct their physicians to refer all their fee for service business to Unilab, and to threaten to kick uncooperative physicians out of their network. (Bibi Dep. at 67:4-68:7,181:9-19, 197:7-199:21.)

In 2003 through early 2005, Baker had various discussions with Guy Seay and Jerry Tice, who each owned laboratory companies sold to Quest in 2003. (Disc. Statement at 17-18.) Tice, who was working for Quest in 2004, described Quest's illegal "pull through" practices and how they had been exported to the company he once owned. (Id. at 18-19.) Seay similarly described Quest's practices. (Id.) Finally, the relators retrieved information contained in Unilab's and

10

Quest's securities filings including Quest's 10-K for 2004, which had been filed on March 10, 2005 and included newly-acquired Unilab. (Dis. Statement at 35-41.) Quest's 10-K stated that "[i]n 2004, we derived approximately 19% of our testing volume and 7% of our net revenues from capitated payment arrangements."[9] (Disc. Statement at 38). FLPA alleges that this disparity between volume and revenue percentages establishes that below cost pricing was the inducement for Quest's capitated arrangements. (Id.)

Based on the totality of this information, Baker initiated the effort to file the instant *qui tam* action. (Bibi Dep. at 147:18-19.) Baker then asked Michaelson and Bibi to join him as relators. (Bibi Dep. at 150:14-19; Michaelson Dep. at 101:17-102:5). Baker told Bibi that having Bibi join as a relator would improve their credibility with the Government. (Bibi Dep. at 156:10-14.) Before deciding to participate in the suit, Bibi reviewed the New York Code of Professional Responsibility[10] and the American Bar Association Model Rules of Professional Conduct to determine whether his participation in the *qui tam* action would be consistent with his ethical obligations as former counsel for Unilab. (Id. at 74:7-76:4.) Bibi testified that because he reasonably believed that Unilab and Quest were continuing to defraud the United States, he concluded that he could rely on exceptions to the ethical rules regarding a lawyer's obligation to maintain client confidences and participate in the action as a relator. (Id. at 74:3-76:4.)

On November 1, 2004, Bibi, Baker and Michaelson entered an agreement to form a litigation partnership, FLPA. The agreement recites that "[t]he Parties have been cooperating and will continue to cooperate to gather, analyze, and synthesize information regarding the

---

[9] When an arrangement is capitated, the purchaser of services pays a flat amount per-member per-month. If those payments are insufficient to cover the costs of the services provided, the provider must nonetheless provide the contracted-for services without receiving additional payment. (Disc. Statement at 20 n.5.)

[10] On April 1, 2009, the New York Code of Professional Responsibility was replaced by the New York Rules of Professional Conduct.

wrongdoing at Unilab and Quest… for the purpose of preparing, filing, and prosecuting an action under the Federal and/or state False Claims Acts." (Def. Memo at 8.) The FLPA partnership agreement appoints Bibi as the partner "responsible for the day-to-day management of the Partnership business and for the implementation of all decisions of the Partners." (Id.) It further provides that Bibi has a 29% interest in any profits or distributions from FLPA. Baker and Michaelson have a 57% and a 14% interest respectively. (Id.) On June 7, 2005, FLPA filed the Original Complaint in this suit under seal and submitted its Disclosure Statement to the United States under seal pursuant to 31 U.S.C. § 3730(b)(2).

    The Motion to Dismiss

    Defendants state that FLPA's SAC, Disclosure Statement and Defendant's limited discovery establish that Bibi disclosed Unilab's confidential information to which he was privy as general counsel, to his partners in FLPA, to FLPA's attorneys, and to counsel for the United States. In doing so, Defendants assert Bibi breached his duty of loyalty to his former client to its disadvantage and for his own personal benefit. FLPA does not contest the characterization of some of this information as confidential but claims that because Bibi had knowledge of a continuing crime, his disclosure fit within an exception to his duty of confidentiality.[11] Examples of these disclosures include the following:

- ████████████████████████████████████████████████████████████

    (Disc. Statement at 14.)

_____

[11] Bibi testified at his deposition that while he was initially hesitant about participating in the lawsuit because of his ethical obligations to Unilab, he "got confident" that he could join as a relator once he reviewed New York's and the American Bar Association's Rules of Professional Conduct. (Bibi Dep. at 74:7-21.) After that, he explained, "[I] intellectually…concluded [that] I could spill my guts…and disclose everything." (Id. at 75: 2-14.)



- ████████████████████████████████████████████
████████████████ (Id. at 19.)
- ████████████████████████████████████████████
███████████████████████ (Id. at 21.)
- ████████████████████████████████████████████
██████████████████████████████
███████████████████████ (Id. at 31.)
- ████████████████████████████████████████████
██████ (Id.)
- ████████████████████████████████████████████

(Id.)

(Def. Memo at 8-9.)

While Baker and Michaelson may have personal knowledge regarding some subset of Unilab's confidential information, they were no longer employed by Unilab after 1996 and 1999 respectively. Accordingly, Bibi is the sole FLPA partner with any personal knowledge about the Kelso period (post-November 1999). (Def. Memo at 9.) In fact, both Baker and Michaelson concede that Bibi has conveyed to them his confidential communications with Whalen during that period. (Id.; Baker Dep. at 179:9-190:1, Michaelson Dep. 198:1-9, Bibi Dep. 179:14-181:8.)

Defendants maintain that the amended complaint should be dismissed and that neither FLPA nor its general partners should be able to proceed with this suit. (Def. Memo at 1.) Defendants assert that dismissal with prejudice of FLPA's claims "is required because the very reason for Bibi's involvement in this litigation was to procure and take advantage of his breach of his ethical duties to his former client" for his own personal gain. (Id. at 25.)

13

**III. Legal Standard**

    Applicability of the New York Code of Professional Responsibility

    While federal courts may look to the Model Rules of Professional Conduct and state disciplinary rules for guidance, such rules are not binding on this Court. Hempstead Video Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005). The "salutary provisions [of the New York rules]" however, "have consistently been relied upon by the courts of this district and circuit in evaluating the ethical conduct of attorneys." Hull v. Celanese Corp., 513 F.2d 568, 571 n.12 (2d Cir. 1975). See Local Civil Rule 1.5(b)(5).

    The "choice of law" provision in the New York Code of Professional Responsibility states that "[f]or conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice…the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise." DR 1-105(B)(1). Bibi is a member of the New York bar (Bibi Dep. at 118:4-6), and this proceeding is pending in the Southern District. Consequently, the choice of law provision in the New York Code indicates that Bibi's actions should be evaluated under New York's Code of Professional Responsibility – the ethics rules which were in effect at the time of Bibi's disclosures.

    The FCA does not preempt state ethical rules: the Court must weigh the federal interests at stake

    In applying the New York Code, it is important to note that the Second Circuit has held that if an interpretation of a state ethical rule is "inconsistent with or antithetical to federal interests, a federal court interpreting that rule must do so in a way that balances the varying *federal* interests at stake." Grievance Committee for the S.D.N.Y. v. Simels, 48 F.3d 640, 646 (2d Cir. 1995). In this instance, the federal interests are the government's interests in

encouraging *qui tam* actions under the FCA and the government's interest in preserving the attorney-client privilege.

In <u>U.S. ex rel. Doe v. X. Corp.</u>, 862 F.Supp. 1502, 1507 (E.D.Va. 1994), the court found that "[n]othing in the False Claims Act preempts state statues and rules that regulate an attorney's disclosure of client confidences." In the words of that court, the Act does not "immunize a relator for actions taken in pursuance of a *qui tam* action that violate state law...[and] where an attorney's disclosure of client confidences is prohibited by state law in a given circumstance, that attorney risks subjecting himself to corresponding state disciplinary proceedings should he attempt to make the disclosure in a *qui tam* suit." <u>Id</u>. Here, Defendants seek dismissal of the *qui tam* relator's action, not disciplinary action for violation of the Code of Professional Responsibility

Because state ethics rules are not trumped by the FCA, the Court must evaluate Bibi's actions in light of the New York Code of Professional Conduct. Specifically, in evaluating this motion to dismiss, the Court must consider: 1) whether the New York Code precludes Bibi's participation as a member of the relator pursuant to DR 5-108 and 2) whether FLPA can proceed against Defendants without confidential information provided by Bibi and protected by DR 4-101.[12] The Court must also consider whether the interests of the Government, the "real party at interest," are injured if it can only proceed alone against the Defendants.

---

[12] In its answer to Court ordered interrogatories, FLPA asserted that "virtually all communications by Unilab seeking legal advice regarding the practices alleged in the complaint are subject to the crime fraud exception." (FLPA Answer to Interrogatory No. 4.) In its moving papers, Defendants objected to the contention that the crime fraud exception applied on these facts. (Def. Memo at 13-15.) FLPA has since dropped this argument. Further, FLPA's expert, Andrew Perlman, agrees with Defendants that the doctrine does not apply on these facts. (Perlman Decl. at 133:6-134:9.) As both parties agree that the crime fraud exception is inapplicable in this circumstance, the Court declines to analyze Bibi's action under that exception.

15

**New York Code of Professional Responsibility DR 5-108**

Defendants claim, supported by the Declaration of their expert Professor Stephen Gillers, that DR 5-108(A) precludes Bibi from serving as a relator in this qui tam action. DR 5-108 states:

> A. Except as provided in DR 9-101[1200.45] (B) with respect to current or former government lawyers, a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:
>
>  1. Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.
>  2. Use any confidences or secrets of the former client except as permitted by DR 4-101 [1200.19] (C) or when the confidence or secret has become generally known.

Plaintiff does not contest that Bibi, in his role as general counsel, advised Unilab on AKS issues that are "substantially related" to those Plaintiff is raising in this case. (Pla. Opp. at 3; Declaration of Andrew M. Perlman "Perlman Decl." ¶ 66.) Further, Plaintiff does not contest, either in its briefing or at oral argument, that this suit is "materially adverse to the interests" of Unilab or that Unilab did not give its consent to Bibi's participation as a relator in this action.[13] (Bibi Dep. at 220:3-7.) The issue raised by Plaintiff in opposing papers is whether a relator in a *qui tam* action is "represent[ing] another person" within the meaning of DR 5-108 such that the provision would preclude Bibi from serving as a *qui tam* relator against the Defendants here.

Plaintiff claims that DR 5-108 is inapplicable on these facts, and that Bibi's actions need not be evaluated under the substantial relationship test because Bibi is not "representing" the

---

[13] FLPA does assert, however, that Bibi should be able to proceed against Defendant Quest because an action against that Defendant would not be materially adverse to the interests of his former client, Unilab. This argument is not persuasive – an action by Bibi, as a member of FLPA, against Quest alone would still have materially adverse consequences for Unilab. Monetary damages against Quest, for example, would harm its wholly-owned subsidiary, Unilab, such that Bibi's action against Quest would be materially adverse to his former client. (See also Gillers Decl. at ¶ 62; Gillers Reply Decl. at ¶ 49.)

relator *as counsel*. Defendants put forth two arguments in response. First, Defendants maintain that Bibi, as a partner of the relator FLPA, is suing as a representative of the United States subject to DR 5-108 because he is not suing to "vindicate a [personal] right … or to redress a [personal] injury." (Def. Reply Memo at 3.) Second, Defendants argue that Bibi should not be able to skirt DR 5-108 by suing a client directly, as a party, when the rule makes clear he would be unable to sue a client indirectly, as counsel of record. Id.

a. **The *qui tam* plaintiff "represents" the United States within the meaning of DR 5-108**

The FCA, 31 U.S.C. 3730(b), states in relevant part:

(1) A person may bring a civil action for a violation of section 3729 *for* the person *and for* the United States Government. The action shall be brought in the name of the Government.

(emphasis added.)

Thus, a *qui tam* action allows a plaintiff to "sue[] on behalf of and in the name of the government" while the "government remains the real party in interest." U.S. ex rel Kriendler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1154 (2d Cir. 1993). A *qui tam* relator, by function of the statute, sues in a representative capacity. See also U.S. ex rel Rockefeller v. Westinghouse Electric Co., 274 F.Supp.2d 10 (D.D.C. 2003). In Rockefeller, the court held that a *qui tam* relator could not proceed pro se with the suit because "[g]enerally, a lay person cannot represent a party in court," id. at 15, and a relator in a *qui tam* FCA action "while having a stake in the lawsuit, represents the interests of the United States." Id. at 16 (citing United States v. Onan, 190 F.2d 1,4,6 (8th Cir. 1951)). The Rockefeller court analogized *qui tam* actions to class and derivative actions to further support its conclusion and found that "[l]ike a stockholder in a

stockholder derivative suit and a class member in a class action suit, a lay relator in a FCA action needs qualified legal counsel to ensure that the real party at interest, the United States, is adequately represented." Id. at 16. "Because the United States is the real party in interest," the court added, "a judgment obtained by a relator may adversely affect the United States' right to 'bring future actions on the same claim asserted here.'" Id. (internal citation omitted). Accordingly, "[c]onsidering what is at stake of the United States when a relator brings a *qui tam* action, representation by a lay person is inadequate to protect the interests of the United States." Id.

Thus, while the FCA gives a *qui tam* relator the statutory authority to bring suits on behalf of the United States, it is the United States, and not the *qui tam* relator, who is seeking to redress fraud on the public treasury and vindicate a personal right. The *qui tam* relator is a representative of the United States and its interests, and accordingly, counsel serving as a *qui* tam relator may come within the scope of DR 5-108. Here, Bibi, as a member of FLPA, is representing another person, the United States, in a matter substantially related and materially adverse to his former representation of Unilab, without his client's consent. His participation in this action is thus in direct violation of DR 5-108.

### b. DR 5-108 does not permit Bibi to do directly, as a party, what he cannot do indirectly, as counsel

Defendants also argue that DR 5-108 must preclude Bibi from participating as a relator because "numerous authorities...agree that a lawyer may not escape the substantial relationship prohibition as set forth in [DR 5-108] by suing a client directly *as a party*, when the lawyer could not do so indirectly as counsel of record." (Def. Reply Memo at 3.)

Ercklentz v. Inverness Management Corp., 1984 WL 8251 (Del. Ch. Oct. 18, 1984)

supports Defendants' contention that allowing Bibi to serve as a relator in this action would

conflict with the legal maxim that "one cannot do directly that which he cannot do indirectly."

See also, Fund of Funds, Ltd. V. Arthur Anderson & Co., 567 F.2d 225, 234 (2d Cir. 1977)

(citing Norman v. McKee, 431 F.2d 769, 772 (9th Cir. 1970)).[14] In Ercklentz, plaintiff, who had

been a member of the defendant's board of directors and its legal counsel for a period of ten

years, brought a derivative action, as representative, against his former client. In disqualifying

the former counsel from serving as plaintiff in this suit, the court found that "the same ethical

considerations which bar an attorney from acting as counsel against his former client also

preclude him from acting as a class or derivative plaintiff against his former client." Ercklentz,

1984 WL 8251 at *4. See also Bakerman v. Sidley Frank Importing Co., Inc., 2006 WL

3927242, at *11 (Del. Ch. Oct. 10, 2006) (same); Khanna v. McMinn, 2006 WL 1388744, at *41

n. 333 (Del. Ch. May 9, 2006) ("The issue of whether [defendant's former general counsel] may

serve a representative plaintiff…implicates considerations distinct from affording an attorney the

opportunity to vindicate rights *personal to him*.") The same maxim applies here. It is evident that

had Bibi appeared in this litigation as counsel for FLPA, rather than as a member of FLPA, his

participation would be precluded by DR 5-108 because his current representation would be

substantially related, and materially adverse, to his former representation of Unilab. Plaintiff

asserts, however, that because Bibi is not FLPA's counsel, but rather, a member of the

partnership itself, DR 5-108 does not preclude his participation. This simply cannot be the case.

Taking this view, as Professor Gillers explains, would "destroy one of the policies behind the

---

[14] In Norman, appellee, who had served as appellant's general counsel while the suit was pending, filed a motion to dismiss the appeal. The Court held that appellee did not have standing to appear against the appellant because allowing him to appear through an attorney would "allow him to do indirectly what he cannot do directly." Id. at 772.

[DR 5-108] – to encourage clients to trust and be candid with counsel," a cornerstone of the lawyer-client relationship.

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981) (internal citation omitted). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Id. Narrowly interpreting the term "represent" in DR 5-108 to mean "represent as counsel" as Plaintiff suggests, (Tr. 12/15/10 at 49), would stand squarely in conflict with the spirit of the rule and the great federal interest in preserving the sanctity of the attorney-client relationship. Such a reading would allow counsel to skirt the protections afforded to clients under DR 5-108 by simply hiring counsel to represent them in any action substantially related and materially adverse to a former representation.[15]

This analysis further supports the conclusion that Bibi cannot avoid the protection offered by DR 5-108 by appearing as a party rather than as counsel against Unilab. Bibi, as a member of FLPA, is representing the United States in this litigation and his actions are in direct violation of DR 5-108.

---

[15] The parties cite to a number of cases where counsel was not disqualified pursuant to DR 5-108, or its equivalent, and was able to sue a former client on matters substantially related and materially adverse to the former representation. These cases are all distinguishable, however, because they arise out of scenarios in which counsel had a personal right and/or interest in the litigation against the former client. See e.g., Murphy v. Simmons, 2008 WL 65174, at *17-19 (D.N.J. Jan. 3, 2008) (where court allowed former counsel for defendant to bring his own claim individually against the defendant but prohibited counsel from joining with co-plaintiffs and from using joint counsel, even though the matter was substantially related to a former representation); Doe v. A. Corp., 709 F.2d 1043 (5th Cir. 1983) (where court disqualified former in-house counsel from serving as a class representative because of a presumption that he would share confidential information, but allowed counsel to pursue his own personal pension claim against his former client, independent of the class); Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975) (where court denied counsel's motion to intervene as a plaintiff in a class action against former client but expressly stated that the denial and disqualification was not intended to prohibit the attorney from pursuing her discrimination claim against the defendant separately).

Contrary to Defendants' position, Plaintiff maintains, supported by the declaration of its expert, Professor Andrew Perlman, that Bibi's conduct is permitted by DR 4-101 of the New York Code. Defendants correctly assert, however, that "this exception does not constitute an exception to Rule [DR 5-108]." (Tr. 12/15/10 at 21.) That is, if Bibi is precluded from serving as a relator in this action pursuant to DR 5-108, as this court finds, he cannot then claim that an exception under DR 4-101 permits his action. Nonetheless, this Court assesses Bibi's behavior under DR 4-101, and concludes that even if DR 5-108 did not prevent Bibi from participating as a realtor in this suit, his disclosures have been beyond that permitted by DR 4-101.

**New York Code of Professional Responsibility DR 4-101**

The rule states in relevant part:

A. "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

B. Except when permitted under DR 4-101 [1200.19] (C), a lawyer shall not knowingly:
   1. Reveal a confidence or secret of a client.
   2. Use a confidence or secret of a client to the disadvantage of the client.
   3. Use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

C. A lawyer may reveal:
   1. …
   2. …
   3. The intention of a client to commit a crime and the information necessary to prevent the crime…

Plaintiff maintains that the information Bibi had at the time of his disclosure "amply supported a reasonable belief that Unilab was continuing in 2005 to violate the AKS" such that his disclosure fit within the "future crime" exception of DR 4-101(C)(3). (Pla. Opp. Memo at 10.) While Bibi may have reasonably believed that Defendants had the intention to commit a

21

crime in 2005, his disclosure went beyond the scope authorized by DR 4-101(C)(3) such that his

actions were in violation of his ethical obligations under that rule.

### a.  Bibi could have reasonably believed in 2005 that Defendants had the intention to commit a crime

While FLPA concedes that Bibi received confidential information during his tenure at

Unilab, it asserts that Bibi's participation in this action as a relator is justified under DR 4-

4101(C)(3) because the information Bibi possessed by 2005 supported the belief that Defendants

had the intention to violate the AKS. Specifically, Plaintiff asserts that based on the facts that: 1)

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (Bibi Dep. at 43:14-

22; 45:10-46:3); 2) Bibi was informed by Baker in 2003 that Unilab, under Whalen, had become

very effective in obtaining the pull-through business (Bibi Dep at 104:4-22; Baker Dep. at

107:17-108:8); 3) Bibi spoke directly with Lanzolatta in a series of meetings in 2004 and 2005

during which time he informed Bibi that under Whalen, Unilab expected the IPAs and HMOs to

refer 100% of their non-managed care business to Unilab, to instruct their physicians to refer all

their fee for service business to Unilab, and to threaten to kick uncooperative physicians out of

their network (Bibi Dep. at 67:4-22, 179:8-17, 199:15-21); 4) Bibi had numerous conversations

in 2003 through 2005 with Guy Seay and Jerry Tice who described Quest's illegal "pull through"

practices (Disc. Statement at 18-19); and 5) Bibi's observations in Unilab's and Quest's

securities filings in 2004 and 2005 which stated that the firm received "approximately 19% of

[its] testing volume and 7% of [its] net revenues from capitated payment arrangements" (Disc.

Statement at 38), Bibi was able to support the belief in 2005 that Quest intended to violate the

AKS such that disclosure of otherwise confidential information was permissible under the future crimes exception of DR 4-101(C)(3).

███████████████████████████████████████████████

███ (Bibi Dep. at 41:4-20; 70: 21-71:6), it is reasonable to infer that Bibi believed Quest intended to violate the AKS in 2005, after he obtained this additional information from Lanzolatta and others. DR 4-101(C)(3), however, only permits lawyers to disclose confidences or secrets "necessary to prevent" the commission of a crime. The question then remains whether Bibi's disclosures were beyond this designated scope.

   Bibi's disclosure in 2005 was beyond the scope permissible by DR 4-101(C)(3)

The future crime exception of DR 4-101(C)(3) is "strictly construed...and is applied only when a client is planning to commit a crime in the future or is continuing an ongoing criminal scheme." NYC Eth. Op. 2002-1, 2002 WL 1040180, at *2 (Mar. 13, 2002). Accordingly, disclosure pursuant to DR 4-101(C)(3) is limited to information necessary to prevent the continuation, or commission, of a crime. DR 4-101(C)(3) does not give former counsel the ability to disclose client confidences regarding completed conduct which satisfies all elements of a crime. Id. Applying this standard to the facts at hand, it becomes evident that Bibi's disclosure of Unilab's confidences was beyond that necessary to prevent the commission of a crime by the Defendants in 2005. Evidence of the continuing crime in 2005 could be shown by evidence of Quest's pricing agreements with MCOs and IPAs in effect in 2005 and not, for example, ████████

████████████████████████████████████

The ethical considerations underlying Canon 4 of the Code emphasize that "a disclosure adverse to the client's interest should be no greater than the lawyer reasonably believes necessary to the purpose." EC 4-7. The disclosure of confidential information dating back to 1996 and

during the period in which Baker was CEO of Unilab goes beyond the scope of information that Bibi could have reasonably believed was necessary to prevent a crime in 2005. ███████ █████████████████████████████████████████████████████████████ █████████████████████████████ Further, FLPA has not articulated a persuasive reason why disclosure of confidences from the 1990s to March 2000 would be necessary to prevent the commission or continuation of a crime in 2005. In fact, the only reason Plaintiff gives to justify this disclosure is that "the claim [in this litigation] goes back to 1996, when Baker and Michaelson fist recognized that the company was engaged in illegal conduct." (Pla. Opp. Memo at 12.) This is beside the point – the fact that FLPA has supplied information for a complaint alleging criminal activity in the 1990s does not mean that Defendants' former attorney was permitted to disclose confidential information obtained during that period as necessary to prevent a continuing crime in 2005.

Beyond his disclosures in the form of the Complaint and the Amended Complaint, Bibi also recommended specific investigative steps to the United States, including, identifying other former Unilab employees whom he advised as General Counsel. (See e.g., Disc. Statement at 15, 18.) Bibi also "parlayed his information into a financial interest" in another *qui tam* suit against Unilab pending in California. (Def. Memo at 9-10.) FLPA is sharing information with the relators in that case. (Declaration of Vincent DiCarlo, Nov. 9, 2009, at ¶18.)

Bibi's contributions to the Complaint and Amended Complaint and his disclosures to Baker, Michaelson, the United States and the California *qui tam* relators were beyond those reasonably necessary to prevent a crime in 2005, and thus beyond the scope of disclosures permitted by DR 4-101(C)(3).

24

Thus, the Court concludes that Bibi's actions were in violation of both DR 5-108 and DR 4-101 and that the appropriate remedy in this instance is to dismiss FLPA's complaint and disqualify FLPA, its general partners, and its counsel from this suit and any subsequent suit based on these facts. This remedy has no effect on the ability of the Government to intervene and proceed against these Defendants on the allegations within the SAC. [16] As such, the interests of the Government, the "real party in interest," in proceeding with this *qui tam* action are sufficiently protected.

## IV. Remedy

Not all violations of the legal code of ethics require dismissal or disqualification of counsel. Nonetheless, when fashioning a remedy, a "trial judge should primarily assess the possibility of prejudice at trial that might result from the attorneys' unethical act." Papanicolaou v. Chase Manhattan Bank, N.A., 720 F.Supp. 1080, 1083 (S.D.N.Y. 1989). Courts in this District have not hesitated to dismiss claims brought by lawyers in situations similar to those at issue here. In Eckhaus v. Alfa-Laval, Inc., 764 F.Supp. 34 (S.D.N.Y. 1991), for example, the Court granted summary judgment for the defendant in a suit by its former in-house counsel on the grounds that there was a "substantial likelihood" that the former lawyer would use or disclose confidential information in the litigation. The defendants in Eckhaus claimed that the plaintiff's suit was an unabashed violation of the rule that an "attorney may not knowingly reveal any client confidence." Id. at 37. Plaintiff justified his disclosure by relying on DR 4-101(C)(4), an exception to the general rule which permits a lawyer to reveal "[c]onfidences or secrets

---

[16] See supra, n. 3. Of course, the Government may also decide that it does not want to proceed in this action. There is some indication within the Disclosure Statement that the market for medical testing services for managed care groups changed during the period charged in the SAC and became a buyer's market. MCOs would aggressively negotiate lower prices for capitated testing prices for all members of its group in light of the "pull through" benefits to the seller. (Disc. Statement at 12, 19-20.)

necessary to establish or collect the lawyer's fee or to defend the lawyer or his or her employees or associates against an accusation of wrongful conduct." The court found that Plaintiff "exceeded the scope of DR 4-101(C)(4)" and granted defendant's motion for summary judgment dismissing the claim. Id. (See also Doe v. A. Corp., 330 F.Supp. 1352 (S.D.N.Y. 1971) (where court dismissed complaint as a violation of Canon 4 in a matter where lawyer sought to bring a derivative action against former client); Wise v. Consolidated Edison Co. of New York, Inc., 282 A.D. 2d 335, 335 (N.Y. App. 2001) (granting defendant's motion to dismiss since "permitting the action to go forward would entail the improper disclosure by plaintiff, an attorney who was in-house counsel to defendant…of client confidences.")) Here, Bibi has violated his ethical obligations under both DR 5-108 and DR 4-101(C)(3) and disclosed confidential information obtained in his role as general counsel of Unilab to his partners and counsel, tainting the FLPA partnership. Consequently, FLPA's complaint must be dismissed and FLPA, its general partners and its counsel must be disqualified from this action and any subsequent action arising out of the same facts.

### a. Dismissing Bibi alone is insufficient

FLPA maintains that dismissal of the entire FLPA partnership is an excessive remedy. Rather, FLPA argues that in the event that Bibi is found to have violated his ethical obligations, the proper remedy is an order precluding Bibi from either participating in the case or requiring his resignation from FLPA. (Pla. Opp. Memo at 24.) Baker and Michaelson, the Plaintiff argues, should be able to pursue the lawsuit without Bibi. (Id. at 25.)

This approach fails to consider that Bibi has violated the his ethical obligations and would allow Baker and Michaelson to profit from Bibi's breaches of Unilab confidences. Defendants do not and cannot know the full extent of Bibi's disclosures of Unilab's confidential

information. Bibi testified, for example, that he reviewed "a table load" of documents which originated from the LSR's office in anticipation of his deposition. (Bibi Dep. at 14:22-16:8.) LSR's office is in the same building where Bibi's office was located at the time he was employed by Unilab. (Id. at 16:12-14.)[17] Today, that same office is the official address of FLPA. (Stein Decl., Ex. 4 at 12.) Thus, it appears that Bibi has maintained access to Unilab's corporate documents possessed by him as general counsel even after his March 2000 departure from the company. There is no way to comprehensively determine which of those Unilab documents he has shared with Baker, Michaelson and counsel. As far as Defendants are aware, there have been no steps taken to set up any screen between Bibi and the other partners of FLPA. (Tr. 12/15/10 at 39.) Moreover, since Bibi, Baker, and Michaelson formed their partnership in 2004, FLPA has pursued this litigation on the basis that Bibi could "spill his guts" and freely disclose Unilab's confidential information. (Def. Reply Memo at 8.) Thus, simply striking from the pleadings any express references of confidential information presently *known* to have been disclosed by Bibi to Baker and Michaelson would not be sufficient to protect the Defendants from its use against them. The scope of Bibi's disclosure is unknown and because these disclosures have been going on since before the formation of FLPA, (see Stein Decl., Ex. 4), or almost seven years, it would be virtually impossible to identify and distinguish each improper disclosure.

Both Baker and Michaelson concede that Bibi disclosed Unilab confidential information to them, (Baker Dep. at 179:9-190:1, Michaelson Dep. at 198:1-9), and it is undeniable that Baker and Michaelson have been tainted by Bibi's conduct. Allowing Baker and Michaelson to proceed with the suit would allow that taint to proceed into trial. See Papanicolaou v. Chase

---

[17] At the time Bibi, Baker, and Michaelson worked for Unilab, its principal place of business was in Tarzana, California, which is where Baker and Michaelson worked. (Baker Dep. at 74:2-6; 76:2-9, Michaelson Dep. at 20:22-22:16.) Bibi was headquartered in Hackensack, New Jersey. (Bibi Dep. at 16:9-15, 33:1-2.)

Manhattan Bank, NA, 720 F.Supp. 1080, 1083 (S.D.N.Y. 1989) ("The rationale behind the
Second Circuit's [substantial relationship] rule I that violations of Canons 4 and 5, by their very
nature, give rise to a high probability that taint of the trial – the real litmus test – *might* occur.")
As such, FLPA, and all three of its general partners must be disqualified from this suit.

### b. Dismissing Unilab as a defendant is insufficient

FLPA also argues that the Court could dismiss the case against Unilab and allow Baker
and Michaelson to pursue only those claims against Quest. Plaintiff argues that because Bibi
"never had an attorney-client relationship with Quest [and] never worked with Quest" Bibi
would have no ethical obligations to the parent company once it purchased Unilab. (Tr. 12/15/10
at 46.) Again, this approach would be inadequate. When control "of a corporation passes to new
management, the authority to assert and waive the corporation's attorney-client privilege passes
as well." Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 349 (1985).
Thus, any obligation Bibi had to Unilab was transferred to Quest upon its purchase. Further,
FLPA cannot prevail against Quest without taking legal positions that are directly contrary to
Unilab's interests. A financial judgment against Quest would also undoubtedly have effects on
Quest's wholly-owned subsidiary, Unilab. (See also, Gillers Decl. at ¶ 62, Gillers Reply Decl. at
¶ 49.) Consequently, simply dismissing Unilab from this action would not fully purge the taint
associated with Bibi's unethical disclosures of Unilab confidences. That taint would still exist in
a case against Quest brought only by Baker and Michaelson.

### c. Disqualification of FLPA's counsel

The disqualification of FLPA's counsel, Troutman Sanders and the Michael Law Group,
is also necessary to protect Defendants from the use of their confidential information against
them. FLPA's counsel has been privy to Unilab's confidential information for the last seven

years, and have made no effort to screen (or be screened) from Unilab's confidential information. (See FLPA Engagement Letter § 10(b) ("Counsel believe they cannot effectively represent the Relator sand the other Parties in the Lawsuit if information disclosed to Counsel by one Party must be preserved by counsel in confidence from the others."))

In Board of Ed. of City of New York v. Nyquist, 590 F.2d 1241 (2d Cir. 1979), the Second Circuit noted "the power of federal courts to disqualify attorneys in litigation pending before them." Id. at 1245-46. Specifically, the Court highlighted two basic situations in which disqualification had been ordered in the Circuit: "1) where an attorneys' conflict of interest in violation of Canon 5...undermines the court's confidence in the vigor of the attorney's representation of his client...[and] 2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage." Id. at 1246 (citing Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d. Cir. 1977); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973)). Here, counsel clearly fall within this second category. Counsel for FLPA are privy to Unilab's, and therefore Quest's, confidential information and are in a position to use that information to give present or subsequent clients an unfair, and unethical, advantage. As such, FLPA's counsel must be disqualified from this action or any subsequent action based on the allegations found in FLPA's complaint.

## V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted and FLPA, its general partners, and its counsel, are disqualified from this suit and any subsequent suit based on these facts. Nothing in this opinion, however, should be deemed as preventing the United States from intervening in this action and from bringing an action against these Defendants.

Copies of this sealed opinion and order were provided only to the Plaintiff and Defendants in this action. Defendants shall provide a redacted copy of this opinion for public filing, and for service on the Government, within ten days of this opinion, and with three days notice to the Plaintiff.

SO ORDERED.

Dated: New York , New York
    March 24, 2011

Robert P. Patterson
U.S.D.J.

30

*Copies of this Opinion and Order sent to:*

**Counsel for Plaintiffs**

**Charles P. Greenman**
Troutman Sanders LLP
405 Lexington Ave
New York, NY 10174
(212) 704-6000
Fax: 212 704 6288

**Eric L. Unis**
Troutman Sanders LLP (NYC)
405 Lexington Avenue
New York, NY 10174
(212) 704-6000
Fax: 212 704 6288

**Philip Roy Michael**
Michael Law Group
The Chrysler Building, 405 Lexington Ave, 7th Fl
New York, NY 10174
(917)-689-1734
Fax: (212)-319-3216

**Counsel for Defendants**

**Richard D. Raskin**
Sidley Austin, LLP (Chicago)
One South Dearborn
Chicago, IL 60603
(312)-853-7000
Fax: (312)-853-7036

**Scott David Stein**
Sidley Austin, LLP (Chicago)
One South Dearborn
Chicago, IL 60603
(312)-853-7520
Fax: (312)-853-7036

**Kevin Michael McGinty**
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC
One Financial Center
Boston, MA 02111
(617) 542-6000
Fax: (617) 542-2241